[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Scott Gardiner, appeals the decision of the defendant Town of Waterford Conservation Commission (hereinafter referred to as the "Commission") granting the application of defendant Reynolds Metals Development Corporation (hereinafter referred to as "Reynolds" or the "applicant") to conduct certain regulated activities on wetlands and watercourses in connection with the subdivision of approximately 188 acres of land into 28 building lots.
The principal issue on this appeal is whether the Commission acted illegally, arbitrarily or in abuse of its discretion in granting Reynolds' application to conduct regulated activities.
FACTS CT Page 4313
Reynolds applied to the Commission on August 10, 1989, for a permit to conduct regulated activities associated with the subdivision of approximately 188 acres of land consisting of the former Waterford-New London Airport into 28 building lots. (ROR #28; #12; #29, pp. 10-11, 15-17). Thirty-four (34) acres, or 18 percent, of the site is wetlands. (ROR #28.)
Reynolds sought a permit from the Commission to construct roadways across watercourses and wetlands, sediment basins adjacent to wetlands, sewer and water lines under watercourses, and to discharge stormwater into wetlands. (ROR #28.) The Commission approved the application with conditions for the following regulated activities; (1) construction of nine retention/detention basins adjacent to wetlands and watercourses; (2) discharge of stormwater into wetlands and watercourses; (3) road crossings for Jordan Brook and No Name Brook; (4) utility crossings for Jordan Brook, No Name Brook and tributary; and (5) permanent fill within wetlands consisting of .20 acres and temporary disturbance within wetlands consisting of .29 acres. (ROR #27.)
The Commission held a public hearing on October 12, 1989, which was continued to October 26, 1989, to November 9, 1989, and to November 16, 1989. (ROR #11; #17; #18; #19; #20.) On December 21, 1989, the Commission approved Reynolds' application for a permit and attached numerous conditions to that approval. (ROR #22; #27.)
Plaintiff Gardiner appealed the Commission's decision and all necessary parties were served, and, as required by section 22a-43 (a), notice was served on the Commissioner of the Department of Environmental Protection (hereinafter referred to as the "DEP). See Connecticut General Statutes Section 22a-43 (a) (rev'd to 1989, as amended).
The defendants, Commissioner of the DEP, Town of Waterford and Waterford Conservation Commission, filed briefs adopting in whole the brief of the defendant Reynolds.
Reynolds also sought and received subdivision approval from the Waterford Planning and Zoning Commission (hereinafter referred to as the "PZC"). The PZC approved Reynolds' subdivision application on April 9, 1990, and plaintiff has appealed that decision as well. See Gardiner v. Reynolds Metals Development Corporation, et al, D.N. 514319. Robert Fromer has also appealed from the Conservation Commission's decision (D.N. 512967) as an intervenor pursuant to Connecticut General Statutes Section 22a-19 (a) (rev'd to 1989). Fromer also appealed from the PZC's decision (D.N. CT Page 4314 514151.) The four appeals were consolidated for trial and were heard together on January 29, 1991, but will be decided in separate memoranda of decision.
Aggrievement
The question of aggrievement is one of fact to be determined by the trial court. Glendenning v. Conservation Commission, 12 Conn. App. 47, 50 (1987), cert. denied,205 Conn. 802 (1989). At the hearing held before this Court on January 29, 1991, the plaintiff proved that he owned land which abuts the land which is the subject of Reynolds' application. The Court, therefore, finds that he is statutorily aggrieved. See Connecticut General Statutes Section 22a-43 (rev'd to 1989, as amended by Connecticut Public Acts No. 89-356, Section 9 (1989)).
Scope of Review on Appeal
A court's review of an agency's decision is of limited scope,[1] Kaeser v. Conservation Commission, 20 Conn. App. 309,311 (1989); and the standard of judicial review is well established.[2] The reviewing court does not make a broad, de novo review of the record. Id. (citation omitted). It does not redetermine factual issues or weigh the credibility of witnesses, as those matters are within the exclusive province of the agency. Id. The court is limited to a review of the evidence and reasoning the agency has placed on the record. Id. (citation omitted) Kaeser, supra, 311. (citation omitted) A trial court may grant relief on appeal from an administrative agency only where the local authority's decision "is arbitrary, illegal or not reasonably supported by the evidence." Red Hill Coalition, Inc. v. Conservation Commission, 212 Conn. 710, 718 (1989). (citation omitted) The plaintiff has the burden of proof in challenging the administrative action. Red Hill, 212 Conn. at 718.
"The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; `(t)he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency.'" Huck v. Inland Wetlands and Watercourses Agency, 203 Conn. 525,539-541 (1987). (citations omitted)
"The reviewing court must take into account (that there is) contradictory evidence in the record . . . but `the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding CT Page 4315 from being supported by substantial evidence. . . .'" Huck,203 Conn. at 542. (citations omitted)
The trial court may not retry the case or substitute its judgment for that of the agency on the weight of the evidence or questions of fact. (citations omitted) Rather, an agency's factual and discretionary determinations are to be accorded considerable weight by the courts. Connecticut Hospital Assn., Inc. v. Commission on Hospitals and Health Care, 200 Conn. 133, 140 (1986).
I. Due Process Claim
The plaintiff initially contends in his brief that the action of the Conservation Commission was illegal because it violated fundamental due process requirements. The plaintiff specifically claims that the Commission failed to allow interested parties, as a matter of right, the opportunity to review the post-hearing submissions required in the conditions of the permit, to cross-examine the experts who prepared the data, or present expert rebuttal testimony in the context of a meaningful forum, namely, a public hearing. Plaintiff refers to the Commission's decision, ROR, #27, p. 4, which states in relevant part that: (i)f any modifications are deemed major by the Waterford Conservation Commission, the Commission may require that a new application for a regulated activity be submitted." Id., (plaintiff's emphasis).
Plaintiff further contends in his brief, p. 14, that the applicant failed to convince the Commission that the proposed development would not detrimentally affect the wetlands and watercourses. Plaintiff asserts that the Commission had serious concerns regarding the structural integrity of the detention basins, the degradation of water quality, and a landfill on the site. Rather than denying the application, plaintiff asserts that the Commission fashioned a permit which allowed the applicant to continue to submit substantive technical information in support of the application following the close of the public hearing.
Plaintiff relies on the Connecticut Supreme Court case of Connecticut Fund for the Environment v. Stamford,192 Conn. 247, 249 (1984), for the proposition that a procedure which prohibits the plaintiff from being given an opportunity to review information relevant to the application, cross-examine the experts who prepared the information, or rebut the information at a meaningful time in the proceedings is illegal.
That case actually states that: "Although proceedings CT Page 4316 before administrative agencies . . . are informal and are conducted without regard to the strict rules of evidence, the hearings must be conducted so as not to violate the fundamental rules of rational justice. (citation omitted) Due process of law requires . . . that at the hearing, the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross examine witnesses and to offer rebuttal evidence." Connecticut Fund, 192 Conn. at 249 (emphasis added).
Therefore, the appropriate time, according to the court in Connecticut Fund, has been held to be at the hearing. However, Connecticut Fund is distinguishable from this case as it involves evidence which did not relate to inland wetlands and was properly excluded by the commission, and therefore is not on point.
Plaintiff further relies on the case of Hawkes v. Town Plan and Zoning Commission, 156 Conn. 207, 212 (1968), where the Commission, following a public hearing, voted to table the applicants' petition and requested additional information from the town planner and the town engineer. The Commission requested information as to existing and proposed topography, all proposed structures, planting plans, heating plans and final water-pipe sizes. Hawkes, 156 Conn. at 212.
The court in Hawkes noted that the information requested by the Commission was within the scope of the detailed plans presented to it at the public hearing and was therefore proper. Id.
The Hawkes court held that "(b)ecause the Commission is composed of laymen, it is entitled to professional technical assistance in carrying out its responsibilities;" and because the plaintiffs did not claim that they were prejudiced by the Commission's consideration of this supplementary information, the court could not say that the Commission acted illegally, arbitrarily or in abuse of its discretion. Hawkes, 156 Conn. at 212-213.
The plaintiff also heavily relies on Carlson v. Fisher, 18 Conn. App. 488 (1989), but his reliance is misplaced. The Carlson court dealt with a post hearing submission of a comprehensive site surface water drainage plan by the applicant, when during the hearing drainage was a matter of great concern and was dealt with in generalities, with no plan of drainage submitted. The Carlson case is inapposite because there was no substantial evidence concerning drainage adduced before the agency. Moreover, in Carlson, post hearing information was crucial to the CT Page 4317 Commission's decision, whereas here, the requested information comprised conditions imposed which would mitigate the impact of the proposed activity pursuant to section 6.1f of the Agency's regulations. (ROR #132, Sec. 6.1f)
In this case, the record reveals statements made by plaintiff's expert, Mr. Robert Schuch, chief engineer with Total Technology, Inc., in which he stated:
 In summary, basically, we — you know, we feel there is a few items that we'd just like to have verification of before we can — we can really come up with an answer in terms of the drainage. It doesn't appear that there is a — too much of an impact on his property, but, you know, we feel that we'd like to have some more verification just to be able to say that.
(ROR #30, Transcript, p. 16.)
The burden of proof to demonstrate that the Board acted improperly is upon the plaintiff. Adolphson v. ZBA,205 Conn. 703, 707 (1988).
The conditions imposed by the Commission in its decision relate to issues and substantial evidence thereon which was discussed at the hearings held before the Commission and are therefore within the scope of those public hearings. The record reveals that the plaintiff had and utilized his opportunity through his experts, to present countervailing evidence on these issues. The plaintiff could have submitted his own calculations at the hearing rather than relying on lack of calculations from defendant Reynolds and its experts. Moreover, the calculations were in large part requested for verification of plans already reviewed and discussed. Finally, the condition relating to calculations imposed in the Commission's decision reflected the plaintiff's concerns which were responded to by the Commission. (See ROR #27, conditions 1, 2, 3, 4, 8 and considerations, A, B, D, B (5 and 6) and I found on pp. 8-9.) The applicant was thereby required to submit the calculations to the town engineer for his review and approval. The detailed plans were already in evidence and plaintiff had ample opportunity to cross examine the applicant's expert witnesses and offer expert testimony on the plans, both of which he did. The plaintiff could have offered his own calculations which he did not; rather, the calculations were requested by the Commission as part of a condition of its permit; not as an ex parte submission, after CT Page 4318 the close of the hearing. It should also be noted that the town engineer is a neutral employee of the agency rather than a representative of a party to the controversy.
Therefore, it is clear that the evidence described above demonstrates that the plaintiff was not prejudiced by the Commission's decision. Moreover, condition 10 states that "(i)f any modifications are deemed major by the Waterford Conservation Commission, the Commission may require that a new application for a regulated activity be submitted. (ROR #27, condition 10.) This would require another public hearing at which the plaintiff presumably would take part, and therefore, the plaintiff cannot show any prejudice.
Record Item 29, Transcript from October 12, 1989 hearing, reveals that a substantial amount of expert testimony was elicited from defendant Reynolds' witnesses, Mr. Daniel Libutti, responsible for development for Reynolds Metals; Mr. William Richter, architect in the firm of Johnson Richter; Mr. Michael Klein, owner of Environmental Planning Services; Mr. Robinson Buck, Engineer with Buck Buck; Mr. Peter Letourneau, with the firm of Haley and Aldrich, geotechnical engineers, scientists and hydrogeologists. Also, for a more detailed discussion of the evidence the Commission heard, see memorandum of decision, Docket No. 512967, Fromer v. Reynolds Development Corporation, et al, New London Judicial District (Teller, J.).
The Connecticut Supreme Court has stated that an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair. Huck v. Inland Wetlands and Watercourses Agency, 203 Conn. 525, 542 (1987).
"The trial court may not substitute its judgment for the wide and liberal discretion vested in the local authority when acting within its prescribed legislative powers. (citations omitted). The Court must invest such broad discretion in these authorities when determining the public need and the manner of meeting it, because they are closest to the circumstances and conditions which create the problem and shape the solution." Frito-Lay, Inc. v. Planning Zoning Commission, 206 Conn. 554, 573 (1988).
Moreover, the Commission is expressly authorized to ". . . grant an application (for a permit) as filed or grant it upon such terms, conditions, limitations or modifications of the regulated activity, designed to carry out the policy of sections 22a-36 to 22a-45, inclusive. . . ." General Statutes CT Page 4319 Section 22a-42a(d).
The Commission held exhaustive hearings on the matter involving four different days and issued a nine-page permit which comprehensively described the activities permitted and the conditions and safeguards imposed. There is substantial evidence in the record to support the Commission's decision, and the Court cannot say that its decision was clearly erroneous. "Courts must be scrupulous not to hamper the legitimate activities of civic administrative boards by indulging in a microscopic search for technical infirmities in their action." Silver Lane Pickle Co. v. Zoning Board of Appeals, 143 Conn. 316, 319 (1956).
 II. Decision of Commission Arbitrary Because Internally Inconsistent
The plaintiff next claims that the decision of the Conservation Commission is arbitrary because it is internally inconsistent. Specifically, plaintiff contends that the permit which was issued by the Commission was an attempt by the Commission to obtain sufficient information from the applicant on which to competently act following the close of the public hearing. Plaintiff asserts in his reply brief, p. 15, that it is obvious that the Commission did not believe that the record supported its own conclusions as to either the structural integrity of the detention basins or the protection of ground waters or surface waters.
Record Item 29, pp. 44-45 reveals testimony from Mr. Peter Letourneau, applicant's expert senior environmental geologist who stated: "Working closely with the team and the civil engineers, we came up with a two-stage detention basin system, which effectively renovates urban runoff." Additionally, there is testimony in the record from Mr. Robinson Buck, applicant's expert who stated the following:
 (A) report was generated that indicated that it would be best to prove a two-stage basin, which are shown on the drawings, that essentially traps these sediments. They are, in effect, open books, particle separators. The question then was raised, the — the purpose of these basins, first of all, the first — in any storm up to a half inch of rain, and then, secondly, they provide storm term detention, to provide the settlement of gross solids, and then, lastly they do CT Page 4320 provide some ground water recharge. . . . We then went back and did a recomputation of the TR-20 analysis for the site, with these basins in place, and found that the increase in peak runoff, due to the on site, small time detention basins, amounts to a one and a half percent increase because of the reduction in time between the peak flow generated on site and the peak flow coming down from the upper watershed. And it was felt that an increase of that magnitude was acceptable and within the total accuracy of the analysis, fairly and significantly.
(ROR #29, pp. 20-30), see also ROR, 106 Memo from Buck and Buck Engineers, p. 1.
Record Item 37 is a study prepared by DiCesare-Bentley Engineers, Inc. regarding sediment basin and storm sewer design introduced at the hearing before the Commission by the applicant Reynolds Metals.
The purpose of the study was to determine the proper sizes of storm sewer drain pipes, sizing of detention basins within the Nevins Brook watershed and the size and number of sediment basins required to meet the environmental criteria recommended by Haley and Aldrich, Inc. (ROR #37, section 1-A Introduction). See also sections I-B, C, pp. 1, 2, 3 and the following which the Commission had before it:
 Although a 100-year frequency storm will not cause overtopping of the sediment basin berms, weir flow will occur, and a 15-minute offset in the peak flow will not be provided. These two factors will reduce the effectiveness of the sediment basins and result in a temporary degradation of water quality but will maintain the structural integrity of the basins. (emphasis added) This temporary degradation in the quality of the water exiting the sediment basins is thought to be insignificant compared with the potential water quality degradation caused by erosion in off-site watersheds and by major flooding during a 100-year storm.
 In the event a storm in excess of the 100-year storm occurs, and significant CT Page 4321 overtopping or failure of the sediment basin occurs, there is not expected to be damage or flooding as a result of these failures, other than temporary degradation of water quality and some local erosion. Since the overall storm drainage analysis prepared by Buck and Buck Engineers indicates that stormwater detention is not required for hydraulic reasons, there is a "Fail-Safe" condition with respect to the basins. Based upon this criteria, failure of a sediment basin will most likely occur at a time which is prior to the peak of the entire Jordan Brook watershed, thus not causing any increase in the peak flow in the brook.
ROR #37, p. 3) (emphasis added).
Record Item #112 is additional information from applicant Reynolds, which was requested by plaintiff Gardiner dated November 16, 1989. The pertinent item in ROR #112 for purposes of this Court's review is the letter from applicant's expert, Mr. John H. McCrane, Project Engineer for DiCesare-Bentley Engineers, Inc., to Mr. Richard Bramerd of Reynolds Metals. The letter addresses certain questions and concerns from the technical review of the project conducted by plaintiff's expert Total Technology Consulting Engineers of New London.
In regard to the previous berm section which surrounds the Basins, paragraph 4 states that the berm section is to be constructed of crushed stone, a layer of geotextile fabric and a blanket of stone riprap. The seepage velocities created by the low water levels of the retention basins will not be great enough to cause the riprap blanket to become unstable. Included in this letter is a quote from (1) Design of Small Dams by the U.S. Department of Interior, pages 256 and 257 which states:
 Embankments of granular or noncohesive materials are more stable than those made of cohesive soils, because granular materials have a higher frictional resistance and because their greater permeability permits rapid dissipation of pore-water pressures resulting from compressive forces. Accordingly, when other conditions permit, somewhat steeper slopes may be adopted for CT Page 4322 non-cohesive soils. Id.
Mr. McCrane further states that the slopes in the basins are considerably flatter than required for a stable structure using local materials and therefore, the stability of the embankments is more than adequate to prevent failure. (ROR #112.)
Furthermore, the Commission's decision with attached condition #8, does provide for the protection of ground waters and surface waters by requiring the applicant to install monitoring wells as specifically requested by the plaintiff's expert, Mr. Ted Stevens, principal hydrogeologist with Ground Water, Inc.
 THE CHAIRMAN: So, looking at your results, I'm not really sure if this is representative of what we have got flowing out of there. It obviously is maybe for the surface, but I'm just wondering what is below the surface.
 MR. STEVENS: Well, I'm wondering the same thing. That's why I think there should be some monitoring wells in that area to detect the ground water quality.
(ROR #30, p. 45.)
Condition #8 of the Commission's decision provides:
 Installation of test wells at the landfill and monitoring of such shall be required as a condition of this permit. Final approval on the placement of the wells and monitoring requirements shall be by the Department of Environmental Protection and Town of Waterford Planning Department. This shall be done in accordance with an overall watershed management and test program.
(ROR #27, condition #8.)
Plaintiff further contends in his brief, pp. 17-18, that the Commission's finding that the applicant had provided for the protection of surface waters and ground waters is patent contradiction given the permit conditions which include that the applicant be required to furnish further engineering analysis so as to establish that the proposed CT Page 4323 regulated activities did not detrimentally affect surface water or ground water quality.
This argument of the plaintiff's has previously been addressed above. The Commission's imposition of conditions #8 and #10 due to the plaintiff's experts' concerns regarding the project's effect on surface and ground waters was well within its discretion, and therefore, the plaintiff's argument must fail.
Additionally, plaintiff contends in his reply brief, pages 9-10, that he has a substantial interest in the outcome of the proceedings, and he has been denied the opportunity to rebut important information submitted, ex parte, by the defendant applicant following the close of the public hearing. Therefore, plaintiff claims that he has been prejudiced.
Condition number 10 of the Commission's decision provides in pertinent part that "(i)f any modifications are deemed major by the Waterford Conservation Commission, the Commission may require that a new application for a regulated activity be submitted." (ROR #27, pp. 4-5.)
The record reveals that the plaintiff has had ample opportunity to rebut the substantial evidence presented before the Commission and could not be prejudiced where condition number 10, as stated above, provides for the submission of a new application if the information which was requested by the Commission constitutes a major modification.
Additionally, section 5.10 of the Agency Regulations provides that the Agency may revoke a permit and require the permit holder to cease all work and file a new application for review if the Agency finds that an activity for which it has granted a permit, or granted a permit with conditions, has had a more severe impact or effect on the inland wetland or watercourse than was projected by the applicant.
Thus, it can be seen that the Commission requires an applicant to submit plans and relevant technical information for the Commission to determine whether activities being (or to be) conducted are consistent with the regulations and within the scope and intent of the permit. See e.g., ROR #132, sections 7.4, 7.1, 7.3, 5.10.
Accordingly, the Commission has the broad discretion to determine whether submitted information, pre or post-decision, would require either an amendment of a permit or the submission of an entirely new permit application as condition #10 provides in this case, necessitating a public CT Page 4324 hearing. The local inland wetlands agency shall serve as the sole agency for the licensing of regulated activities. Aaron v. Conservation Commission, 183 Conn. 532, 551 (1981); Connecticut General Statutes Section 22a-42(c). And in fulfilling its responsibilities under the legislation, which expressly allows municipal regulation of wetlands, the agency must . . . "(e)nvisage the adaptability of (the statutory scheme) to infinitely variable conditions for the effectuation of the purposes of these statutes." Huck, supra, 550-551. And, as previously stated, the Commission is expressly authorized by law to grant permit applications, upon ". . . such terms, conditions, limitations, or modifications of the regulated activity, designed to carry out the policy of sections 22a-36
to 22a-45, inclusive." Connecticut General Statutes Section22a-42a(d). The Court cannot say on this record that the Commission's actions were in violation of General Statutes Section 4-183(j).
 III. Decision of Commission Arbitrary Because Applicant Failed to Comply with Standards of Connecticut General Statutes Section 22a-41
Lastly, the plaintiff contends that the decision of the Commission is arbitrary because the applicant failed to comply with the mandatory standards set forth in Connecticut General Statutes Section 22a-41.[3]
Connecticut General Statutes Section 22a-42a(d) states in pertinent part that "(i)n granting, denying or limiting any permit for a regulated activity the inland wetlands agency shall consider the factors set forth in section 22a-41. . . ." Id. See Aaron, 183 Conn. at 552; see also Section 6.1 of the Inland Wetlands Regulations.
The plaintiff argues in his brief, pp. 20-21, that the applicant had failed to demonstrate that the detention basins were structurally sound so as not to constitute a hazard due to flooding which would pose a threat to the safety of the property in violation of Connecticut General Statutes Sections 22a-36 and 22a-41.
This particular claim has previously been addressed and has no merit.
Plaintiff next argues that the applicant had also failed to demonstrate the impact of the stormwater drainage generated by the project on wetlands and watercourses and on the landfills.
ROR #30, pp. 45-47, is the transcript of the public CT Page 4325 hearing held on October 26, 1989 and reveals the following discussions in regard to the impact of the proposed development and stormwater drainage on the landfills:
 THE CHAIRMAN: Anybody have any other questions? Does the Applicant have any questions?
 MS. MORRISON: I have one more, too. What is the impact of this development that's being proposed on the landfill?
 MR. STEVENS: I don't believe the development itself has any impact on the landfill. As far as I know, there's no changes in the landfill, since it has been inactive for in excess of twenty years, has a good growth on it, and I wouldn't propose to disturb that because that will create a lot of evapotranspiration and runoff, so it will prevent that much more water from going through the landfill. If there were any drainage swales proposed through the landfill or disturbance of that nature, I would say that it would have an adverse impact. But, I don't don't believe that's part of the application.
 THE CHAIRMAN: Any other questions, Pat?
MS. MORRISON: No.
 THE CHAIRMAN: Anybody else? The Applicant? Okay. Bob, please identify yourself.
 MR. FROMER: Robert Fromer. I have just one question for Mr. Stevens, a simple question. Do you have computer models that could determine the — or project, as a function of time, what the flownet would be underneath that dump, as a function of time and also distance?
 MR. STEVENS: Well, there are computer models that are available, both to model the groundwater flow and also containment transport. We have, at our access in our CT Page 4326 office, computer flow models, not containment transport models, but since this — this material is carried in sloughs, basically if you're looking at — if you're looking at groundwater flow, it's somewhat analogous to a containment transport. Right now there is not enough information to generate a model. A model could be generated based on the studies of this nature, perhaps more detailed, but I think — my personal opinion is you get better data from the field data, sampling the wells, getting the concentrations in the wells, rather than projecting it and seeing what a computer would say about it.
(ROR #30) (emphasis added).
Stevens is the principal hydrogeologist with Ground Water, Inc. and was retained as plaintiff's expert. Stevens stated that he does not believe that the development itself has any impact on the landfill. (ROR #30, p. 45.) It is clear that the Commission could have considered this evidence in formulating its decision. See also ROR #38, supplemental information booklet, re: Overall Drainage, Site Drainage, Water Quality and Environmental Review.
Stevens further stated this concern at the hearing held on October 26, 1989, in regard to the Nevins Brook Landfill, formerly the Airport Landfill, that the monitor wells were not placed in a good location to determine what impact the existing landfill is having on ground water and surface quality; (ROR #30, p. 36) and, he suggested to the
Commission a proposed monitoring program which would adequately monitor the ground water and surface water quality impacts of this landfill. (ROR #30, p. 38) Additionally, Stevens stated that when he met with defendant Reynolds' consultant to discuss his proposal, he was in general agreement with the monitoring requirements which the plaintiff's expert, Stevens, proposed. (ROR #30, 38-39.) Condition #8 of the Commission's decision addressed the concerns raised by the plaintiff's expert, Mr. Stevens, at the hearings held before the Commission, and therefore it was reasonable for the Commission to rely on this. See also ROR #59, letter from Theodore Stevens to Scott Gardiner re: Waterford Airport property and ROR #123, letter from Theodore Stevens to Commission dated November 15, 1989. There was thus substantial evidence in the record on this issue. CT Page 4327
The Court concludes that the Commission reasonably considered the environmental impact of the applicant's proposed activity, including its effects on the wetlands, watercourses and landfills, when it formulated its decision with conditions pursuant to Connecticut General Statutes Section 22a-41(a)(1), and also considered the character and degree or injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened pursuant to Connecticut General Statutes Section 22a-41(a)(5).
ROR #27, p. 8, para. A, of the Commission's decision states that "strict adherence to the conditions imposed with this permit will protect the quality of surface and ground waters on the subject property.
ROR #27, Inter-Office Correspondence to the Commission from Pat Morrison, Environmental Planner, dated November 30, 1989, provides recommendations by Town Staff based on review of documentation submitted in this application. Under Section C entitled `Monitoring,' p. 2, the Town Staff recommended that information which has been submitted by plaintiff's expert, Groundwater, Inc., will be reviewed as part of the final development of the monitoring program. The process of closing the landfill and developing the monitoring plan was begun prior to submission of the application and is being performed as part of an overall watershed management and testing program. This involved review of several other sources of pollutants.
The recommendations further stated that the Commission should require water monitoring to be done and allow test wells to be installed upon development and approval of a final water monitoring program. (ROR #27, p. 2.)
These recommendations reflect that the Commission addressed the plaintiff's concerns with the environmental impact of the proposed project on the landfill area and its possible effect on ground water and surface water qualities. An examination of the nine-page permit and conditions issued by the Commission clearly shows that the Commission thoroughly and thoughtfully considered all of the factors indicated in General Statutes Section 22a-41(a) and (b) together with other relevant facts and circumstances.
The Court has examined the record and concludes that the ultimate findings and conclusions of the Commission were supported by substantial evidence in the record and were not clearly erroneous, and further concludes that the plaintiff has not sustained his burden of proof that the Commission has acted illegally, arbitrarily or in abuse of its discretion. CT Page 4328 The plaintiff's appeal is therefore dismissed.
Teller, J.